UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-CV-24400-DPG

TERRI MARSHALL,

      Plaintiff,

vs.

CARNIVAL CORPORATION,

      Defendant.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, Terri Marshall, sues Defendant, Carnival Corporation, and alleges:

### A. Case Summary

1. This is a personal-injury/negligence action brought by a cruise-ship passenger against a cruise line as a result of a fall on a cruise ship.

### B. Rule 9(h)(1) Designation: Diversity Jurisdiction

2. The Plaintiff's claim for relief arises out of an accident that happened on a ship sailing in navigable waters, while the ship was engaged in an activity—pleasure cruising—bearing a substantial relationship to traditional maritime activity, so the Plaintiff's claim for relief falls within the court's admiralty/maritime jurisdiction.

3. But the Plaintiff's claim also falls within the court's subject-matter jurisdiction on diversity-of-citizenship grounds because:

    (a) the Plaintiff is a citizen of Pennsylvania;

    (b) the Defendant is a citizen of the Republic of Panama and the state of

Florida, as it is a corporation incorporated under the laws of the Republic of Panama and its principal place of business is in Florida; and

(c) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. So the Plaintiff designates her claim as one brought at law under the court's diversity-of-citizenship jurisdiction.

5. But although this claim is brought at law rather than in admiralty, it is still governed by the general maritime law.

## C. Venue

6. The Plaintiff has filed this case here because the Plaintiff's cruise ticket contains a forum-selection clause that requires actions such as this to be filed in the United States District Court in Miami, Florida. (The Plaintiff only reluctantly brings this case in federal court, however: she wanted to bring this case in state court, as is her right under the "saving clause" of 28 U.S.C. § 1333(1), but the Defendant's forum-selection clause has forced her into federal court instead.)

## D. Five Counts of Negligence

### Count 1
### Carnival's Vicarious Liability for Its Crewmember's Negligence in Turning Off Lighting for the Single-Step Change in Elevation

Ms. Marshall adopts the allegations of paragraphs 1 through 6.

7. The Defendant, Carnival Corporation, owns and operates a cruise ship, the *Carnival Celebration*, that sailed from Miami, Florida, on May 20, 2023, on an eight-night southern Caribbean cruise.

8. The Plaintiff, Ms. Terri Marshall, along with her husband, Glenn Marshall, and other family members, were fare-paying passengers on the cruise.

9. In the common area on the serenity deck section of deck 18 there is a

2

small stairway consisting of a single step that allows passengers to descend to the next level which is just a few inches below.

10. Because that section of deck 18 is outdoors and gets very dark at night, those stairs are supposed to be illuminated.

11. But on or about the evening of May 26, 2023—the seventh night of the cruise—that stairway was left completely dark, making that step virtually invisible. (That night was outdoor movie night on deck 18, so perhaps when the crew dimmed the lights for the movie, they inadvertently dimmed the stairway's lights too.)

12. At one point that evening, Ms. Marshall got into an elevator to head up to deck 18 to join her husband and other family members. She exited the elevator on deck 18, and walked over to the section of the deck where they were supposed to meet up.

13. Ms. Marshall was approaching the stairway but, in the darkness, couldn't see it and didn't know it was there, so when she reached the stairway and stepped forward expecting her foot to land on the floor ahead of her, instead her foot landed on air and she tumbled face-first to the hard floor.

14. The force of Ms. Marshall's face striking the floor knocked her unconscious. And there she lay, alone, while her husband and other family members wondered where she was.

15. Ms. Marshall doesn't know how long she lay there, but when she began to come to she saw that some passengers had gathered around her and were trying to help. Then one of the ship's medical crew—a nurse—arrived with a wheelchair and was able to help Ms. Marshall up and into the chair. A security person paged Glenn Marshall and told him what had happened and asked him to meet them back at the Marshalls' cabin.

16. At the Marshalls' cabin, the ship security man was more interested in asking how much Ms. Marshall had had to drink—she'd had two sips of wine at dinner—than in her injuries. Ms. Marshall felt sore all over and had a terrible headache, so she took some Advil and went to sleep. The next morning she felt

3

worse but decided to wait to obtain medical care at home, since they'd be arriving back in Miami in less than twenty-four hours.

17. When the Marshalls got home, Glenn took Terri straight to a local hospital, where Terri was immediately taken for a brain CT scan. The CT scan was quickly interpreted by an astute radiologist who saw that Terri was experiencing an intracranial hemorrhage—a life-threatening brain bleed—right then and there, so a decision was made to rush her by ambulance to a nearby trauma hospital.

18. An intracranial hemorrhage is a life-threatening injury because there is very little available space within the cranium where the blood leaving the brain can go, so what little space there is between the outer surface of the brain and the inner wall of the cranium quickly fills with blood. Then, as the brain continues to bleed and the blood has nowhere to go, the trapped blood begins to press in upon the brain, damaging brain tissue and causing excruciating headaches. And if enough damage is done by the severe compression of the brain, death ensues. But doctors were able to get Ms. Marshall's brain to stop bleeding and were able to save her life. But the hemorrhage damaged Ms. Marshall's brain, and the full extent of the damage isn't yet known.

19. Today, about seven months after the accident, Ms. Marshall, a 62-year-old retired nurse, still suffers from headaches and still sleeps very poorly, with sleep frequently interrupted by intense nightmares. She has memory problems, balance problems, and she sometimes struggles with basic reasoning and with basic word selection. And two months after the accident—in July 2023—she was suddenly hit with depression, for which she's now being actively treated. She's also suffered an injury to her optic nerve, which has cost her of much of her peripheral vision, although she was recently cleared to drive a car again. Her friends and family say she's not the same Terri she was before her brain injury. Ms. Marshall also fractured her left elbow when she hit the floor. Photos taken shortly after the accident show dark bruising around her left eye and the left side of her neck, as well as along her left arm. The bruising around her eye is still visible now seven months after the accident.

20. In summary, this accident has caused Ms. Marshall to suffer bodily injury and resulting pain and suffering, disability, physical impairment, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. The losses are either permanent or continuing and Ms. Marshall will continue to suffer these losses in the future.

21. Carnival and its crew owed Ms. Marshall a duty of reasonable care while Ms. Marshall was a guest on their ship.

22. A member of Carnival's crew who was responsible for ensuring that that area was appropriately illuminated at night breached that duty of care by failing to turn on the lights that illuminate that stairway after it got dark, or by turning off those lights when it was not safe to do so, causing Ms. Marshall to fall down because she couldn't see the step.

23. That crewmember was acting within the course and scope of his or her employment with Carnival when he or she committed that breach, so Carnival is vicariously liable for the crewmember's negligence under the respondeat-superior doctrine.

24. All conditions precedent have occurred or been performed.

Therefore, the Plaintiff, Terri Marshall, demands judgment against the Defendant, Carnival Corporation, for more than $75,000 in damages, and costs, and the Plaintiff requests a jury trial.

### Count 2
### Carnival's Vicarious Liability for its Crewmember's
### Failure to Warn Ms. Mathis About the Stair and Lack of Lighting

Ms. Marshall adopts the allegations of paragraphs 1 through 6.

25. The Defendant, Carnival Corporation, owns and operates a cruise ship, the *Carnival Celebration*, that sailed from Miami, Florida, on May 20, 2023, on an eight-night southern Caribbean cruise.

26. The Plaintiff, Ms. Terri Marshall, along with her husband, Glenn

Marshall, and other family members, were fare-paying passengers on the cruise.

27. In the common area on the serenity deck section of deck 18 there is a small stairway consisting of a single step that allows passengers to descend to the next level which is just a few inches below.

28. Because that section of deck 18 is outdoors and gets very dark at night, those stairs are supposed to be illuminated.

29. But on or about the evening of May 26, 2023—the seventh night of the cruise—that stairway was left completely dark, making that step virtually invisible. (That night was outdoor movie night on deck 18, so perhaps when the crew dimmed the lights for the movie, they inadvertently dimmed the stairway's lights too.)

30. At one point that evening, Ms. Marshall got into an elevator to head up to deck 18 to join her husband and other family members. She exited the elevator on deck 18, and walked over to the section of the deck where they were supposed to meet up.

31. Ms. Marshall was approaching the stairway but, in the darkness, couldn't see it and didn't know it was there, so when she reached the stairway and stepped forward expecting her foot to land on the floor ahead of her, instead her foot landed on air and she tumbled face-first to the hard floor.

32. The force of Ms. Marshall's face striking the floor knocked her completely unconscious. And there she lay, alone, while her husband and other family members wondered why she hadn't shown up at their meeting spot.

33. Ms. Marshall doesn't know how long she lay there, but when she began to come to she saw that some passengers had gathered around her and were trying to help. Then one of the ship's medical crew—a nurse—arrived with a wheelchair and was able to help Ms. Marshall up and into the chair. A security person paged Glenn Marshall and told him what had happened and asked him to meet them back at the Marshalls' cabin.

34. At the Marshalls' cabin, the ship security man was more interested in asking how much Ms. Marshall had had to drink—she'd had two sips of wine at dinner—than in her injuries. Ms. Marshall felt sore all over and had a terrible

6

headache, so she took some Advil and went to sleep. The next morning she felt worse but decided to wait to obtain medical care at home, since they'd be arriving back in Miami in less than twenty-four hours.

35. When the Marshalls got home, Glenn took Terri straight to a local hospital, where Terri was immediately taken for a brain CT scan. The CT scan was quickly interpreted by an astute radiologist who saw that Terri was experiencing an intracranial hemorrhage—a life-threatening brain bleed—right then and there, so a decision was made to rush her by ambulance to a nearby trauma hospital.

36. An intracranial hemorrhage is a life-threatening injury because there is very little available space within the cranium where the blood leaving the brain can go, so what little space there is between the outer surface of the brain and the inner wall of the cranium quickly fills with blood. Then, as the brain continues to bleed and the blood has nowhere to go, the blood begins to press in upon the brain, damaging brain tissue and causing excruciating headaches. And if enough damage is done by the severe compression of the brain, death ensues. But doctors were able to get Ms. Marshall's brain to stop bleeding and were able to save her life. But the hemorrhage damaged Ms. Marshall's brain, and the full extent of the damage isn't yet known.

37. Today, about seven months after the accident, Ms. Marshall, a 62-year-Old retired nurse, still suffers from headaches and still sleeps very poorly, with sleep frequently interrupted by intense nightmares. She has memory problems, balance problems, and she sometimes struggles with basic reasoning and basic word selection. And two months after the accident—in July 2023—she was suddenly hit with depression, for which she's now being actively treated. She's also suffered an injury to her optic nerve, which has cost her of much of her peripheral vision, although she was recently cleared to drive a car again. Her friends and family say she's not the same Terri she was before her brain injury. Ms. Marshall also fractured her left elbow when she hit the floor. Photos taken shortly after the accident show dark bruising around her left eye and the left side of her neck, as well

as along her left arm. The bruising around her eye is still visible seven months after this accident.

38.  Carnival and its crew owed Ms. Marshall a duty of reasonable care while Ms. Marshall was a guest on their ship.

39.  In summary, this accident has caused Ms. Marshall to suffer bodily injury and resulting pain and suffering, disability, physical impairment, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. The losses are either permanent or continuing and Ms. Marshall will continue to suffer these losses in the future.

40.  A member of Carnival's crew who was responsible for ensuring that that area was appropriately illuminated at night breached that duty of care by failing to post some type of warning to alert anyone approaching the then-invisible stairs that there were stairs ahead, and that failure to post a warning caused Ms. Marshall to fall down because she couldn't see the step and wasn't made aware that it was there.

41.  That crewmember was acting within the course and scope of his or her employment with Carnival when he or she committed that breach, so Carnival is vicariously liable for the crewmember's negligence under the respondeat-superior doctrine.

42.  All conditions precedent have occurred or been performed.

Therefore, the Plaintiff, Terri Marshall, demands judgment against the Defendant, Carnival Corporation, for more than $75,000 in damages, and costs.

### Count 3
### Carnival's Direct Liability for Insufficient Lighting
### Around the Single-Step Change in Elevation

Ms. Marshall realleges the allegations of paragraphs 1 through 6.

43. The Defendant, Carnival Corporation, owns and operates a cruise ship,

the *Carnival Celebration*, that sailed from Miami, Florida, on May 20, 2023, on an eight-night southern Caribbean cruise.

44. The Plaintiff, Ms. Terri Marshall, along with her husband, Glenn Marshall, and other family members, were fare-paying passengers on the cruise.

45. In the common area on the serenity deck section of deck 18 there is a small stairway consisting of a single step that allows passengers to descend to the next level which is just a few inches below.

46. That section of deck 18 is outdoors and is supposed to be illuminated.

47. But on or about the evening of May 26, 2023—the seventh night of the cruise—that single step change in elevation was left completely dark because both the step light and the other lights on the deck were turned off for the showing of a movie outdoors on deck 11, making that step virtually invisible.

48. Carnival is on notice that dangerous conditions on its outdoor decks are created or exacerbated when it turns off all deck lights for movie night. Carnival has been sued for a slip and fall on a transitory substance on movie night, due in part to the darkness of the deck, so that Carnival has notice of the danger posed by turning off the lights for movie night. *See Hostert v. Carnival Corp.*, 2024 WL 68292 (S.D. Fla. 2024) (denying motion for summary judgment and noting that the deck was dark because the overhead lights were off during movie night).

49. Accordingly, Carnival was on notice of the dangers created by turning off the deck lights for movie night. Even one prior substantially similar incident is sufficient evidence of notice to defeat a summary judgment. *See, Cogburn v. Carnival Corp.*, 2022 WL 1215196 (11th Cir. 2022).

50. That evening, Ms. Marshall took an elevator to deck 18 to join her husband and other family members. She exited the elevator on deck 18, and walked over to the section of the deck where they were supposed to meet up.

51. As Ms. Marshall approached the elevation change, it was dark and she couldn't see it and didn't know it was there, so when she reached it and stepped forward expecting her foot to land on the floor ahead of her, instead her foot landed on air and she tumbled face-first to the hard floor.

52. The force of the impact when the left side of Ms. Marshall's face struck the floor was so hard that it knocked her completely unconscious. And there she lay, alone, while her husband and other family members wondered where she was.

53. Ms. Marshall doesn't know how long she lay there unconscious, but when she began to come to she saw that some passengers had gathered around her and were trying to help. Then one of the ship's medical crew—a nurse—arrived with a wheelchair and was able to help Ms. Marshall up and into the chair. A security person paged Glenn Marshall and told him what had happened and asked him to meet them back at the Marshalls' cabin.

54. At the Marshalls' cabin, the ship security man was more interested in asking how much Ms. Marshall had had to drink—she'd had two sips of wine at dinner—than in her injuries. Ms. Marshall felt sore all over and had a terrible headache, so she took some Advil and went to sleep. The next morning she felt worse but decided to wait to obtain medical care at home, since they'd be arriving back in Miami in less than twenty-four hours.

55. When the Marshalls got home, Glenn took Terri straight to a local hospital, where Terri was immediately taken for a brain CT scan. The CT scan was quickly interpreted by an astute radiologist who saw that Terri was experiencing an intracranial hemorrhage—a life-threatening brain bleed—right then and there, so a decision was made to rush her by ambulance to a nearby trauma hospital.

56. In summary, this accident has caused Ms. Marshall to suffer bodily injury and resulting pain and suffering, disability, physical impairment, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. The losses are either permanent or continuing and Ms. Marshall will continue to suffer these losses in the future.

57. Carnival owed Ms. Marshall a duty of reasonable care while Ms. Marshall was a guest on their ship.

58. Carnival breached that duty of care by failing to illuminate the single step change in elevation particularly because it was movie night, so the main deck

10

lights were already off, causing Ms. Marshall to fall down and sustain severe physical injuries because she couldn't see the step.

59.  All conditions precedent have occurred or been performed.

Therefore, the Plaintiff, Terri Marshall, demands judgment against the Defendant, Carnival Corporation, for more than $75,000 in damages, and costs, and the Plaintiff requests a jury trial.

**Count 4**
**Carnival's Direct Liability for Failure to Warn**
**About the Single-Step Change in Elevation**

Ms. Marshall realleges the allegations of paragraphs 1 through 6.

60.  The Defendant, Carnival Corporation, owns and operates a cruise ship, the *Carnival Celebration*, that sailed from Miami, Florida, on May 20, 2023, on an eight-night southern Caribbean cruise.

61.  The Plaintiff, Ms. Terri Marshall, along with her husband, Glenn Marshall, and other family members, were fare-paying passengers on the cruise.

62.  In the common area on the serenity deck section of deck 18 there is a small stairway consisting of a single step that allows passengers to descend to the next level which is just a few inches below.

63.  Because that section of deck 18 is outdoors and gets very dark at night, that feature is supposed to be illuminated.

64. But on or about the evening of May 26, 2023—the seventh night of the cruise—that single step change in elevation was left completely dark, making that step virtually invisible.

65.  It was completely dark because it was movie night and the main deck lights were out.  Notwithstanding Carnival's weekly movie night and at least one prior slip and fall due to movie night darkness, Carnival failed to warn its passengers such as Ms. Marshall that the lights would be out and that special caution should be taken when walking on the dark deck.

66. That evening, Ms. Marshall took an elevator to deck 18 to join her husband and other family members. She exited the elevator on deck 18, and walked over to the section of the deck where they were supposed to meet up.

67. As Ms. Marshall approached the elevation change, it was dark and she couldn't see it and didn't know it was there, so when she reached it and stepped forward expecting her foot to land on the floor ahead of her, instead her foot landed on air and she tumbled face-first to the hard floor.

68. The force of the impact when the left side of Ms. Marshall's face struck the floor was so hard that it knocked her completely unconscious. And there she lay, alone, while her husband and other family members wondered where she was.

69. Ms. Marshall doesn't know how long she lay there unconscious, but when she began to come to she saw that some passengers had gathered around her and were trying to help. Then one of the ship's medical crew—a nurse—arrived with a wheelchair and was able to help Ms. Marshall up and into the chair. A security person paged Glenn Marshall and told him what had happened and asked him to meet them back at the Marshalls' cabin.

70. At the Marshalls' cabin, the ship security man was more interested in asking how much Ms. Marshall had had to drink—she'd had two sips of wine at dinner—than in her injuries. Ms. Marshall felt sore all over and had a terrible headache, so she took some Advil and went to sleep. The next morning she felt worse but decided to wait to obtain medical care at home, since they'd be arriving back in Miami in less than twenty-four hours.

71. When the Marshalls got home, Glenn took Terri straight to a local hospital, where Terri was immediately taken for a brain CT scan. The CT scan was quickly interpreted by an astute radiologist who saw that Terri was experiencing an intracranial hemorrhage—a life-threatening brain bleed—right then and there, so a decision was made to rush her by ambulance to a nearby trauma hospital.

72. Carnival owed Ms. Marshall a duty of reasonable care while Ms. Marshall was a guest on their ship.

73. Carnival breached that duty of care by failing to illuminate the single step change in elevation, causing Ms. Marshall to fall down and sustain severe physical injuries because she couldn't see the step.

74. In summary, this accident has caused Ms. Marshall to suffer bodily injury and resulting pain and suffering, disability, physical impairment, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. The losses are either permanent or continuing and Ms. Marshall will continue to suffer these losses in the future.

75. All conditions precedent have occurred or been performed.

Therefore, the Plaintiff, Terri Marshall, demands judgment against the Defendant, Carnival Corporation, for more than $75,000 in damages, and costs.

## Count 5
## Negligent Design

Ms. Marshall realleges the allegations of paragraphs 1 through 6.

76. Carnival entered into a contract for the construction of the *Carnival Celebration* (Construction Contract).

77. The Construction Contract provided that the ship would be built to Carnival's specifications.

78. Carnival approved the plans for the ship.

79. Carnival designed the ship.

80. Carnival approved the design of the ship.

81. The *Carnival Celebration* was built for Carnival to its specification and design.

82. The single step change in elevation where Ms. Marshall was injured was designed by Carnival.

83. Carnival approved the design of the single step change in elevation upon which Ms. Marshall was injured.

84. Carnival had numerous representatives present at the ship building yard, supervising and overseeing construction.

85. During construction Carnival could have made design changes to the ship, including the design of the single step change in elevation where Ms. Marshall was injured.

86. Carnival inspected, accepted, and approved the ship and the single step change in elevation where Ms. Marshall was injured before the ship was placed in service as well as after she was placed in service.

87. Carnival manages the entire ship building process from initial business opportunity to post delivery warranty and everything in between.

88. Carnival has a team made up of specialists in naval architecture, plan approval, outfitting, marine, electrical and safety engineering, as well as expert project managers who approve all elements of the vessel including the design of the single step change in elevation involved in this incident.

89. Carnival owed Ms. Marshall a duty of reasonable care while Ms. Marshall was a guest on its ship.

90. Carnival's negligent design and approval of the single step change in elevation breached that duty of care.

91. Carnival's negligent design and approval of the single step change in elevation was the proximate cause of Ms. Marshall's injury.

92. All conditions precedent have occurred or have been performed.

Therefore, the Plaintiff, Terry Marshall, demands judgment against Defendant, Carnival Corporation, for more than $75,000 in damages, and costs, and the Plaintiff requests a jury trial.

## E. Request for Jury Trial

The Plaintiff requests a jury trial.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court via CM/ECF on September 17, 2024. I also certify that the

14

foregoing was served on all counsel or parties of record per the below **Service List**

either via transmission of Notices of Electronic Filing generated by CM/ECF or in

some other authorized manner for those counsel or parties who are not authorized

to receive electronic Notices of Filing.

Respectfully submitted,

David W. Singer (FL Bar No. 306215)
dsingeresq@aol.com
Peter G. Walsh (FL Bar No. 970417)
pwalsh@1800askfree.com
David W. Singer & Associates, PA
1011 South Federal Highway
Hollywood, FL 33020
954-920-1571
*Attorneys for Plaintiff, Terri Marshall*

Philip D. Parrish, P.A.
*Co-counsel for Plaintiff*
7301 SW 57th Court, Suite 430
Miami, Florida 33143
Tel.: 305-670-5550/Fax 305 670-5552
Email: phil@parrishappeals.com
        betty@parrishappeals.com

By:   ***/s/ Philip D. Parrish***
        Philip D. Parrish
        Florida Bar No. 0541877

15

## SERVICE LIST

Donnise DeSouza Webb, Esq.
Carnival Corporation
3655 N.W. 87th Avenue
Miami, FL  33178-2428
Tel. 305-406-4838 Direct
Tel. 305-599-2600 Ext. 18073 (Assistant's Phone)
Fax 305-406-4732
ddesouza@carnival.com
dtrester@carnival.com
*Counsel for Defendant*

David W. Singer, Esq.
dsinger@aol.com
Peter G. Walsh, Esq.
pwalsh@1800askfree.com
David W. Singer & Associates, P.A.
1011 South Federal Highway
Hollywood, FL  33020
Tel. 954-920-1571
Fax 954-926-5746
*Counsel for Plaintiff*

W. Cooper Jarnigan, Esq.
Cooper.jarnigan@gray-robinson.com
Ashley Genoese, Esq.
Ashley.genoese@gray-robinson.com
Michael Drahos, Esq.
Michael.drahos@gray-robinson.com
GrayRobinson, P.A.
515 N. Flagler Drive, Suite 650
W. Palm Beach, FL  33401
Tel. 561-268-5727
Fax 561-268-5745
*Counsel for Defendant*